UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| FLORIDA B. DOUCET | CIVIL ACTION NO. 04-1231-A |
| -vs- | JUDGE DRELL |
| CITY OF BUNKIE, ET AL. | MAGISTRATE JUDGE KIRK |

### REASONS FOR JUDGMENT

In this case involving a claim for use of excessive force by a police officer effecting an arrest, we must make a credibility call to determine the facts upon which liability, or the lack of it, turns. We must also then decide, based upon those facts, whether the force used was objectively reasonable. Then, if appropriate after such analysis, we must determine a damage award.

Although the claims originally plead were broader, pretrial motions and rulings thereon have left only the excessive force claims for determination. The remaining defendants are Reggie Sanders and his employer, the City of Bunkie. A bench trial was held July 17 - 18, 2007. Considering the evidence and argument of counsel, and for the reasons set forth below, this Court will render judgment as follows: in favor of Plaintiff, Florida B. Doucet, and against Defendants, Reggie Sanders and the City of Bunkie, in the amount of $6,150.00 plus legal interest and costs as provided by law. All of Plaintiff's remaining claims will be DISMISSED with prejudice.

## I. ISSUES AND FINDINGS OF FACT

When ruling on an earlier motion for partial summary judgment, we found the following facts to have been presented in the evidence submitted:

> On June 7, 2003, Officers Sanders and Officer Jones responded to a call of disturbance at the Plantation Apartments involving Quinton Brown. Upon arriving at the apartment complex, the officers observed Mr. Brown running toward a wooded area located to the rear of the complex. At that time, Officer Sanders and Officer Jones exited their units and proceeded to pursue Mr. Brown on foot. Unable to apprehend Mr. Brown, the officers turned around and headed back toward the complex, at which time they encountered Mr. Brown's mother, Florida Doucet. Officer Sanders and Ms. Doucet disagree as to the events which transpired thereafter.
>
> According to Officer Sanders, after witnessing the pursuit of her son, Ms. Doucet began screaming loudly at the officers exclaiming, "[W]hy are y'all trying to kill my son?"[1] After repeated attempts to calm Ms. Doucet and upon noticing several tenants exiting their apartments in response to the screaming, Officer Sanders advised Ms. Doucet that she was under arrest for Disturbing the Peace. At that time, Ms. Doucet resisted arrest and ran toward the complex's parking lot. Officer Sanders apprehended Ms. Doucet and continued to effect the arrest. Ms. Doucet, however, refused to permit Officer Sanders to handcuff her. According to Officer Sanders, each time he grabbed her "she would turn around and tuck her hands behind her."[2] As a result of Ms. Doucet's unwillingness to cooperate, Officer Sanders sprayed her in the face with his chemical weapon (Freeze Plus P). Officer Sanders then handcuffed Ms. Doucet and placed her in the back of his unit. At which time, Ms. Doucet was transported to the Bunkie City Police Station, booked and imprisoned.
>
> Ms. Doucet, however, tells a different story. According to her, believing that her son was under impending death, she asked Officer Sanders "[W]hy they was running behind my son with guns?"[3] Following her inquiry, Officer Sanders handcuffed Ms. Doucet and placed her under arrest. At that time, she was transported to jail . . . . Ms. Doucet contends that she neither screamed nor raised her voice when speaking to Officer

---

[1] Document No. 48, Exhibit A.

[2] Id.

[3] Document No. 44, Exhibit B.

Sanders. Further, Ms. Doucet asserts that Officer Sanders employed his chemical weapon (Freeze Plus P)[4] after she was placed under arrest.

As a result of the abovementioned incident, Ms. Doucet was charged with Resisting an Officer. On June 16, 2003, Ms. Doucet appeared at the City Court of Bunkie to answer the charges brought against her. At that time, Ms Doucet entered a guilty plea for the lesser charge of Disturbing the Peace.[5]

Additional evidence adduced at trial included the offense report Officer Sanders completed on the day of the incident, in which he noted Plaintiff ran from him before she was handcuffed.[6] A recorded statement dated September 2003 shows he also told Detective Roland Patterson, who was investigating the incident, that Plaintiff ran away before she could be restrained.[7] However, during his trial testimony, Officer Sanders explained that Plaintiff did not actually run from him, but she did make her way quickly through the parking lot. He estimated she had travelled forty to fifty feet before he was able to apprehend her. Officer Sanders said he did not notice Plaintiff's limp until it was brought to his attention at the police station later in the evening. Additionally, Officer Sanders explained that he made the decision to use his chemical weapon rather than some other type of control technique in order to avoid long-term injury to Plaintiff.

---

[4] Officer Sanders tesitified that "Freeze Plus P" is a chemical weapon enhanced with pepper spray. Plaintiff's expert, Dr. Lloyd Grafton, described "Freeze Plus P" as the strongest chemical agent in use by police departments. Both Officer Sanders and Dr. Grafton acknowledged the immediate effects of "Freeze Plus P," including burning and breathing difficulties, may persist up to forty-five minutes after the chemical is applied. Dr. Larry Gould, Defendants' expert, described the weapon as "powerful," and as having the effect of temporarily blinding a person and drawing her attention from the officer to the spray.

[5] Document No. 56.

[6] Exhibit J-1.

[7] Exhibit P-6.

During her trial testimony, Ms. Doucet clarified that she did, indeed, raise her voice during the incident, and that she did not calm down when Officer Sanders instructed her to do so. Plaintiff further explained that she stumbled or stepped away from Officer Sanders while he was handcuffing her, but she did not intentionally pull away from him. Ms. Doucet also stated that she was handcuffed with her hands behind her back, the restraints were secured before she was placed in the patrol car, and the chemical agent was applied as she was sitting in the back seat of the vehicle and her feet were still outside of the car. Plaintiff said that at the time of her arrest, she was quite heavy and had difficulty getting into a vehicle unless she used her hands to lift her legs. She did not, however, ask Officer Sanders to help her get her legs into the car on the night at issue.

Additional testimony was presented by Russell Jones, who was formerly employed as a police officer in Bunkie, and who assisted Officer Sanders on the evening of June 7, 2003. Although Mr. Jones was not attending directly to Ms. Doucet during the entire incident, he did recall that Plaintiff was loud and irate, even after Officer Sanders verbally commanded her to calm down. Mr. Jones also said he saw Ms. Doucet step or pull or tug away while Officer Sanders was handcuffing her, and he saw Plaintiff put up some resistance when Officer Sanders tried to place her in the back seat of his patrol car. However, Mr. Jones thought Officer Sanders had the situation under control. Mr. Jones testified that Ms. Doucet was handcuffed when Officer Sanders was putting her into the vehicle, she did not run across the parking lot, and she walked with a limp. Mr. Jones further explained he did not think Plaintiff had been sprayed with a chemical agent

before the time he saw her being placed in the back seat of the automobile, because he is familiar with the way people react after encountering "Freeze Plus P," and Ms. Doucet was not exhibiting that behavior. In a recorded statement given to Detective Roland Patterson in September 2003, Mr. Jones disagreed with Officer Sanders's decision to utilize a chemical agent on Plaintiff.[8]

Plaintiff also called Dr. Lloyd Grafton, who was qualified as an expert in the use of force. Dr. Grafton took the Court through portions of the PPCT[9] Defensive Tactics Student Manual, including the "Resistance Control Continuum."[10] Officer Sanders testified that he was familiar with this continuum, which explains the general levels of control an officer should exert in response to degrees of resistance asserted by a subject.

According to the continuum, the levels of resistance and the coordinating levels of control to be analyzed in this case would fall somewhere in the following range: (a) passive resistance (such as failure to react to verbal commands), to which soft empty hand control techniques (such as joint locks, pressure points, or light knee strikes that have little or no potential for injury) would be appropriate; (b) defensive resistance (such as pulling/pushing away or resistance to handcuffing), to which hard empty hand control techniques (such as a palm heel strike to the torso or a knee strike to the thigh that have the potential to cause bruises, contusions, or lacerations) would be appropriate; and (c) active aggression (such as advancing, punching, kicking, grabbing, etc.), to which the

---

[8] Exhibit P-7.

[9] "PPCT" is an abbreviation for "Pressure Point Control Tactics." (Exhibit P-11.)

[10] Exhibit P-11, p. 3-10.

use of intermediate weapons (such as a baton or chemical weapon) would be appropriate.[11]

Specifically, the manual explains:

> PPCT encourages officers to think of the PPCT Resistance/Control Continuum as a reactionary continuum. In other words, the Resistance/Control Continuum teaches officers to respond to a specific level of resistance with a specific level of control. For example, if an officer faces an armed subject who is about to shoot the officer, the officer does not have to escalate to deadly force by first using empty hand control or the use of intermediate weapons. The officer simply escalates to deadly force accordingly. The use of nonlethal force is no different. The only time when the One Plus One Theory would not be appropriate is when a variable would affect the common sense of the officer.
>
> In any officer/subject contact there is the potential for injury to the officer and/or subject. As the subject's resistance or aggressive actions increase, the potential for injury to the officer increases. When the officer escalates control methods to gain control of the subject, the potential for injury to the subject increases.[12]

Dr. Grafton testified that if Ms. Doucet were handcuffed and sitting in the back seat of the police car, but she was not responding to verbal commands to put her legs in the car (passive resistance), the use of soft empty hand techniques, such as helping her lift her legs into the vehicle, would have been an appropriate exercise of control by the officer. If Ms. Doucet had one hand secured by a handcuff, and she was stepping, pulling, or tugging away so the officer could not complete application of the handcuffs (defensive resistance), it would be proper for the officer to escalate to a modified hard empty hand technique level of control, like holding her arms tightly and forcing her to lean over part of the car. Dr. Grafton would recommend this modified technique, given

---

[11] Exhibit P-11, pp. 3-10 - 3-13.

[12] Exhibit P-11, p. 3-10.

Ms. Doucet's age and physical condition, in comparison to those of Officer Sanders at the time of the incident. Dr. Grafton opined that even if Ms. Doucet had continued to pull her arm away or attempt to elude completion of the handcuffing, it would not be proper for an officer to employ a chemical weapon in the absence of active aggression on Ms. Doucet's part.

Defendants called Dr. Larry Gould, who was qualified as an expert in police policies and procedures, including arrest and use of force. Dr. Gould explained he felt Ms. Doucet was displaying defensive resistance by pulling away from Officer Sanders more than once after one handcuff had been applied. Under these circumstances, Dr. Gould opined that Officer Sanders's use of a chemical agent did not constitute a violation of appropriate police policies or procedures. The expert based this testimony, in part, on his experience that a hard empty hand control technique is more likely to cause injury than use of a chemical weapon. Additionally, Dr. Gould stated that the law enforcement handbook published by the Louisiana District Attorney's Association follows a force continuum that would allow the use of a chemical agent before a hard empty hand technique of control was employed.[13] The expert compared this favorably with the statement in the PPCT manual that intermediate weapons are justified when lower forms of hard empty hand techniques have failed, those techniques would be dangerous to the officer, and they would potentially escalate resistance from the subject. In reaching this conclusion, Dr. Gould emphasized that the loose end of a set of handcuffs may injure the officer or the subject. Therefore, it is important to secure the

---

[13] Dr. Gould testified he had no information Officer Sanders had been trained in accordance with the Louisiana District Attorney's Association law enforcement handbook.

second cuff as soon after the first one is applied as is practical. Dr. Gould also said that, under the circumstances, he did not think it would have been appropriate for Mr. Jones, who was attending to Mr. Doucet, to help Officer Sanders subdue Ms. Doucet, because the husband could have posed a threat to the situation.

The defense expert further explained that if Officer Sanders applied the chemical agent after Ms. Doucet was fully handcuffed, regardless of whether the spraying was done inside or outside of the patrol vehicle, the action would have constituted a violation of proper police policies and procedures. He also opined that it probably would have been a violation of proper procedures for Officer Sanders to deploy his chemical weapon after he "placed one handcuff to the suspect[']s left wrist at which time the suspect pulled away from police and refused to cooperate," as stated in the Offense Report dated June 7, 2003,[14] in the absence of other circumstances demonstrating continued resistance on Ms. Doucet's part. Dr. Gould agreed that bending Ms. Doucet over the police cruiser, which was in close proximity to the scene, would have been another method by which Officer Sanders could have attempted to subdue Plaintiff. The expert further stated that the standards depicted in the force continuum and actually used in practice are fluid and may be interpreted differently by different officers or experts. However, he agreed that an officer should use the least amount of force needed to effect an arrest.

---

[14] Exhibit J-1.

## II. APPLICABLE LAW

As the Fifth Circuit has explained:

"[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness standard.' As in other Fourth Amendment contexts, however, the 'reasonableness' inquiry in an excessive force claim is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them . . . .

* * *

It is clearly established law in this circuit that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must allege '(1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need[,] and the excessiveness of which was (3) objectively unreasonable.' In gauging the objective reasonableness of the force used by a law enforcement officer, we must balance the amount of force used against the need for that force.

* * *

[W]e believe that the amount of injury required to prevail in an excessive force action depends on the context in which the injury occurs. Nonetheless, this circuit currently requires a plaintiff to have 'suffered at least some injury.' As the Supreme Court has recognized, however, 'the extent of injury suffered by a [plaintiff] is one factor that may suggest whether the use of force' was excessive 'in a particular situation.' Therefore, the amount of injury necessary to satisfy our requirement of 'some injury' and establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances.[15]

In this case, the evidence shows Ms. Doucet was loud and uncooperative during the incident. The Court does not, however, believe that this obese woman with asthma and a limp (an infirmity which was apparently obvious to everyone but Officer Sanders),

---

[15] Ikerd v. Blair, 101 F.3d 430, 433-435 (5th Cir. 1996) (internal citations omitted). See also Freeman v. Gore, 483 F.3d 404 (5th Cir. 2007).

actually ran/moved quickly away from him or posed any threat to his safety.[16] Indeed, Mr. Jones, the other officer on the scene that night, said it appeared Officer Sanders had the situation under control. Given that the circumstances surrounding the chemical's application as explained by Officer Sanders and Ms. Doucet are diametrically opposed, this Court has paid particular attention to Mr. Jones's testimony on this point. Although Mr. Jones did not actually see Officer Sanders use the weapon, he believes the chemical agent was *not* deployed prior to the time Ms. Doucet was seated in the police car. All the testimony agrees that Ms. Doucet was handcuffed before she was placed in the vehicle. Both experts testified that use of the chemical weapon after Ms. Doucet was handcuffed would be a violation of police policies and procedures.

Applying the standard outlined in the jurisprudence cited above to the facts as established by the totality of the evidence, the undersigned finds that Officer Sanders's use of a chemical weapon on Ms. Doucet constituted an unreasonable and excessive use of force.

The Court further finds that Officer Sanders's conduct caused injury to Plaintiff. The medical records from Bunkie General Hospital show Ms. Doucet was treated in the emergency room on June 8, 2003 for blurred vision, a headache, a burning sensation to her face, and trauma to her left wrist. Physical examination revealed inflamed sclera and conjunctiva as well as a minor bruise to her left forearm. Ms. Doucet's eyes were irrigated, and she was instructed to continue this procedure as needed.[17] Plaintiff

---

[16] Even the defense expert, Dr. Gould, defined Ms. Doucet's behavior, as described by Officer Sanders, as "defensive resistance," or actions designed only to prevent the officer from gaining control.

[17] Exhibit P-9.

testified she had to clean out her eyes every four hours for seven to ten days. Ms. Doucet also stated that her pre-existing asthma was exacerbated by the chemical agent.[18] Although minor, these conditions did result directly from the excessive use of force and are injuries sufficient to support the Plaintiff's claims of a constitutional violation.

Under Louisiana law, the excessive use of force in effectuating an arrest "transforms ordinarily protected use of force into an actionable battery, rendering the defendant officer and his employer liable for damages."[19] In Kyle v. City of New Orleans, 353 So.2d 969 (La. 1977), the Louisiana Supreme Court set forth certain factors a court should consider when determining if the force used by an arresting officer was reasonable under the circumstances. These factors include:

> (1) the known character of the arrestee; (2) the risks and dangers faced by the officer; (3) the nature of the offense or behavior involved; (4) the chance of escape if the particular means are not employed; (5) the existence of alternative methods of arrest or subduing the arrestee; (6) the physical size, strength and weaponry of the officers as compared to that of the arrestee; and (7) the exigencies of the moment.[20]

Applying these factors to the evidence presented at trial, as analyzed above, the undersigned finds Officer Sanders's use of "Freeze Plus P" was unreasonable and excessive under Louisiana law.

---

[18] The record contains a pharmaceutical receipt for a corticosteroid that was dispensed on July 15, 2003 at the request of "Dr. Brar" (not the physician who treated Plaintiff at the Bunkie General Hospital emergency room), as well as another receipt from that date, which is apparently for a refill to Plaintiff's asthma inhaler. (Exhibit P-10.) However, no medical evidence connects these medications, which were distributed more than one month after the arrest, to any injuries that could reasonably be related to application of the "Freeze Plus P."

[19] Patton v. Self, 06-1029 (La. App. 3d Cir. 3/7/07); 952 So.2d 874, 878, quoting Penn v. St. Tammany Parish Sheriff's Office, 2002-0893 (La. App. 1st Cir. 4/2/03); 843 So.2d 1157, 1161.

[20] Patton v. Self, 952 So.2d at 878.

The law is clear that a governmental agency or municipality, such as the City of Bunkie, may only be held liable for an unconstitutional or illegal policy or custom that contributes to a constitutional tort. "[A] municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[21] However, under Louisiana law, "Masters and employers are answerable for the damage occasioned by their servants . . . in the exercise of the functions in which they are employed."[22] "The use of force when necessary to make an arrest is a legitimate police function. But if the officers use unreasonable or excessive force, they and their employer are liable for any injuries which result."[23]

Although the Court has not located, and counsel has not provided, recent jurisprudence outlining an appropriate range of general damage awards for injuries such as those sustained by Ms. Doucet, the Court finds $6,000.00, plus the documented special damages of $150.00 (for the Bunkie General Hospital visit) to be reasonable under the circumstances.

### III. CONCLUSION

For the foregoing reasons, this Court RENDERS JUDGMENT AS FOLLOWS: IN FAVOR OF PLAINTIFF, Florida B. Doucet, and against Defendants, Reggie Sanders and

---

[21] Monell v. Dep't of Social Services, 436 U.S. 658, 691 (1978) (emphasis in original).

[22] La. C. C. art. 2320.

[23] Kyle v. City of New Orleans, 353 So.2d at 972.

the City of Bunkie, in the amount of $6,150.00 plus legal interest and costs as provided by law.  All of Plaintiff's remaining claims will be DISMISSED with prejudice.

Counsel shall submit an appropriate Judgment.

SIGNED on this 10th day of March, 2008 at Alexandria, Louisiana.

_____<br>
DEE D. DRELL<br>
UNITED STATES DISTRICT JUDGE